UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

UNITED STATES OF AMERICA,

- against -

CLYDE MILLER,

                              Defendant.

-----------------------------------------------------------------

**MEMORANDUM & ORDER**
17-CR-00415 (MKB)

MARGO K. BRODIE, United States District Judge:

      Defendant Clyde Miller is charged in a one-count indictment with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). (Compl. 1, Docket Entry No. 1.) On September 21, 2017, Defendant moved to suppress physical evidence and statements obtained by law enforcement officers after a search of his person on April 17, 2017. (Def. Mot. to Suppress ("Def. Mot."), Docket Entry No. 11.) The Court held a suppression hearing on October 20, 2017. (Minute Entry dated October 20, 2017; Tr. 1.) At the hearing, after considering testimony from Special Agents James Lee, Richard Demurjian, and Ian Neckin as to the circumstances of the arrest, the Court determined that there was probable cause to arrest Defendant. (Tr. 157:2–12.) However, the Court granted Defendant leave to brief additional arguments explaining why the supervisory officer who authorized the arrest should be required to testify. (*Id.* at 157:23–158:6.) Having reviewed the additional submissions, and for the reasons stated below, the Court adheres to its ruling on the record at the hearing that there was probable cause to arrest Defendant but suppresses the statement made by Defendant prior to receiving *Miranda* warnings.

## I. Summary of testimony

According to the testimony of Special Agents Lee, Demurjian and Neckin, on April 17, 2017, the Drug Enforcement Agency ("DEA") was engaged in an undercover drug trafficking investigation with a primary focus on an individual named Anthony Sean Yancey. (*See* Tr. 4:2–10; 128:13–19; Pl. Mem. in Opp'n to Def. Mot. ("Pl. Mem.") 2, Docket Entry No. 14.) As part of the undercover operation, the DEA had arranged for the sale of three kilograms of heroin worth approximately $170,000 by Yancey to the undercover officer. (Tr. 4:6–17.) While the deal had been negotiated in Florida, Yancey traveled from Winterville, North Carolina to Brooklyn, New York to complete the transaction. (Tr. 56:13–16; 80:1–3; 141:2–4; Pl. Mem. 2.) Based on the officers' experience, the large quantity of heroin involved also signaled that there would be "more than one person showing up to the drug deal." (Tr. 5:6–8; 61:6–9.)

As part of the operation, the DEA agents conducted surveillance of Yancey from approximately 10:30 AM on the morning of April 17, 2017. (*Id.* at 5:19–21.) They observed Yancey with Defendant and another individual named Randy Jenkins on Winthrop Street in Brooklyn throughout the morning. (*Id.* at 7:1–5; Pl. Mem. 2.) Around 11:30 AM, a Lincoln Navigator arrived at Winthrop Street and William Fagan, the driver, and Yancey engaged in a conversation outside of Defendant's presence. (Tr. 34:18–35:25.) Yancey also answered and made several telephone calls outside of Defendant's presence. (*Id.* at 10:1–6.) At some point between 1 and 2 PM, Defendant, Jenkins, and Yancey left Winthrop Street in a white Dodge Durango. (*Id.* at 11:3–7.) Later, the Durango, with the same occupants, arrived at a Hilton Hotel near the JFK Airport, the agreed upon location of the drug transaction. (*Id.* at 15:12–17.) After Yancey got out of the Durango in the parking lot of the Hilton, the Durango parked about a block away. (*Id.* at 17:13–18.) Based on their experience, the officers were not surprised about where the Durango was parked because "there's usually somebody nearby either as a lookout or

getaway car or somebody who provides extra manpower in case something bad happened" in a drug transaction. (*Id.*) Shortly thereafter, Fagan arrived at the Hilton parking lot in the Lincoln Navigator. After speaking with Fagan, Yancey walked inside the Hilton. (*Id.* at 19:7–9.) Fagan walked to a Honda Pilot parked nearby and then proceeded to walk into the Hilton, carrying a small black bag. (*Id.* at 19:19–20:13.) Inside the Hilton, Yancey showed the undercover agent the drugs in a bathroom. (*Id.* at 20:14–21.) After showing the undercover agent the drugs, Yancey and Fagan walked outside. (*Id.* at 20:24.) Shortly thereafter, Andy Butorac, the supervisory officer, signaled over the radio to arrest everyone involved including those in the "Durango and the Honda Pilot where Mr. Fagan was walking to." (*Id.* at 21:8–10.) Throughout the entire operation, all of the officers involved were in constant communication via radio. (*See id.* at 27:25–28:5.)

Once the signal to arrest was communicated, Special Agent Neckin pulled up in his car "nose to nose" with the Durango. (*Id.* at 103:23–24.) Special Agent Neckin got out of his car, weapon drawn, and ordered Defendant out of the Durango. (*Id.* at 104:12–13.) Defendant was ordered to lay on the ground with his hands out. (*Id.* at 104:14–16.) After Defendant complied, and prior to giving *Miranda* warnings, Special Agent Neckin asked Defendant whether he had any weapons on his person. (*Id.* at 104:16–18.) In response, Defendant admitted that he had a gun in his waistband. (*Id.* at 104:18–19.) Throughout the arrest, Defendant "was . . . very, very compliant." (*Id.* at 104:11–12.)

## II. No additional testimony is necessary

Defendant argues that he is entitled to hear from the supervisory agent who authorized his arrest. According to Defendant, this is necessary because applying the reasoning from *United States v. Di Re*, 332 U.S. 581 (1948), the supervisory agent may have had exculpatory evidence

to undermine probable cause to arrest.[1]  (Def. Post Hearing Supp. Briefing ("Def. Supp.") 2–4, Docket Entry No. 17.)  Defendant argues that, Yancey "singled out" Defendant from the narcotics deal by, among other things, talking with Fagan outside of Defendant's presence.  (Id. 3–4.)  The Government argues that Defendant's interpretation of *Di Re* is erroneous and has been rejected by the Second Circuit in *United States v. Delossantos*, 536 F.3d 155, 159 (2d Cir. 2008).  The Government distinguishes *Di Re* from this action on a number of grounds, including the fact that the former involved "a *police informant* [who] singled out a specific individual as the guilty party and not another individual in the same vehicle."  (Pl. Opp'n to Def. Supp. ("Pl. Opp'n") 4, Docket Entry No. 18 (emphasis added).)

As explained on the record, the totality of the circumstances support a finding of probable cause to arrest Defendant.  (*See* Tr. 135:10–20.)  Yancey traveled from out of town for the purpose of meeting with an undercover agent to complete a drug transaction.  (*Id.*)  After arriving in New York, agents observed Yancey in the presence of Defendant throughout the day of the drug deal.  (*Id.*)  Further, Defendant was in the passenger seat of the Durango when Yancey was dropped off at the Hilton to meet with the undercover agent.  (*Id.*)  The Durango also parked approximately one block away, suggesting that the occupants were lookouts or muscle for the drug transaction.  (*Id.* at 97:6–8.)  Finally, Yancey met with the undercover, displayed the heroin, and was arrested in possession of the contraband.  (*Id.* at 135: 17–20.)  In light of these circumstances, the Court remains unpersuaded by Defendant's interpretation of *Di Re*, and, more importantly, the need for additional testimony from the supervisory agent.  (*See* Tr. 137–141);

---

[1] As the Court explained, the Government is already obligated to turn over any exculpatory evidence.  (*See also* Tr. 129:19–21 (statements by Government refuting any "suggestion [that] . . . there's exculpatory evidence" that has not been turned over to Defendant).)

*see also Delossantos*, 536 F.3d at 160 ("The Court in *Di Re* was careful to note that [t]he argument that one who accompanies a criminal to a crime rendezvous cannot be assumed to be a bystander is indeed forceful enough in some circumstances." (citation and internal quotation marks omitted)). Thus, the Court adheres to its prior finding of probable cause to arrest Defendant and to seize the physical evidence.

### III. The Court suppresses the statement made prior to *Miranda* warnings

Defendant moves to suppress his statement that "he had a gun and that it was in his waistband" as a violation of *Miranda*. (Def. Mot. 10; Pl. Mem 13.) The Government argues that the agent's questioning falls within the public safety exception to the *Miranda* requirement. (Pl. Mem 5.) In support of its argument, the Government principally relies on dangers inherent to drug conspiracies, in light of the circumstances in this case. (*See* Tr. 57:3–7 ("I was concerned because for a first-time transaction, that's a lot of money that's going to be involved for people that have never done business before . . . It's possibly . . . a robbery or a kidnapping.").)

The Second Circuit has consistently warned that the public safety exception "must not 'be distorted into a *per se* rule as to questioning people in custody on narcotics charges.'" *United States v. Estrada*, 430 F.3d 606, 613–14 (2d Cir. 2005); *United States v. Reyes*, 353 F.3d 148, 155 (2d Cir. 2003) ("We emphasize that it cannot become a matter of course to precede every *Miranda* warning with the questions that were put to [the defendant]."); *United States v. Jones*, 154 F. Supp. 2d 617, 628–29 (S.D.N.Y. 2001) (explaining while a close question, information provided by a confidential informant about the existence of a firearm provided officers "some specific reason, beyond generalizations about drug dealers, to think a gun was present"). Instead, the Second Circuit has consistently required advance or contemporaneous notice of danger separate and apart from the drug conspiracy itself. *See Estrada*, 430 F.3d at 613 (finding officers had advance notice of defendant's "assault convictions"); *Reyes*, 353 F.3d at 151 (police officers

5

"were aware that [defendant] usually carried a gun"); *see also United States v. Ferguson*, 702 F.3d 89, 90 (2d Cir. 2012) (police officers were informed that the defendant had "fired two shots"); *United States v. Newton*, 369 F.3d 659, 663 (2d Cir. 2004) (police informed by defendant's mother that "her son kept a gun in a shoe box by the door of her home"); *United States v. Simmons*, 661 F.3d 151, 153 (2d Cir. 2011) (officers informed that the defendant had "displayed a silver handgun during a dispute" with a roommate "days earlier"); *United States v. Nazario*, 374 F. App'x 63, 65 (2d Cir. 2010) (officers questioned "whether there was an accompanying weapon" "[o]nly after finding the bullets"); *United States v. McKeckney*, 29 F. App'x 627, 629 (2d Cir. 2002) (officers were informed that "the conspirators were connected to various robberies and at least one homicide"). Indeed, the Second Circuit has so held even in the context of a "major narcotic trafficking operation," (*see Estrada*, 430 F.3d at 613), and also during the commission of a "buy-and-bust" operation, (*see Reyes*, 353 F.3d at 150). While the exception may not require much more, courts nevertheless recognize that a drug conspiracy in and of itself is insufficient. *See, e.g.*, *United States v. Howard*, No. 08-CR-211, 2010 WL 3608118, at *7 (W.D.N.Y. May 10, 2010), *report and recommendation adopted*, No. 08-CR-211, 2010 WL 3608064 (W.D.N.Y. Sept. 9, 2010) (applying exception in drug investigation case of a third party where the officer "noticed 'a bulge in [the defendant's] front pocket"); *United States v. Nelson*, 489 F. Supp. 2d 309, 316 (S.D.N.Y. 2007) (applying exception in drug case given defendant's "increasingly anxious demeanor and conduct").

Here, the Government has not presented any evidence of danger other than generalizations about the type of drug conspiracy involved,[2] and under these circumstances

---

[2] While the Government appears to argue that the unique nature of the transaction provided additional evidence and even advance notice of potential danger, such concerns should

where Defendant was compliant and laying prone on the ground at gunpoint, the "narrow" public safety exception is inapplicable. *See New York v. Quarles*, 467 U.S. 649, 654 (1984) (establishing the "narrow" public safety exception); *Estrada*, 430 F.3d at 613 (holding exception applied because of knowledge of prior assault convictions in addition to credited assertion that "firearms are tools of the drug trade that are commonly kept on the premises of major narcotics dealers"); *Reyes*, 353 F.3d at 154 (holding exception applied in buy-and-bust because, in addition to recognition that firearms are "tools of the [drug] trade," an informant provided information prior to arrest that defendant "typically carried a gun"); (*see also* Tr. 161:20–24 (explaining officers "[did not] know anything about [Defendant]" and were solely relying on their perception of the type of drug conspiracy involved).) The Court grants Defendant's motion to suppress the statement made prior to being informed of his *Miranda* rights.

---

have largely dissipated once Yancey's meeting with the undercover agent concluded without incident. At the hearing, the agents testified that they were concerned about a potential robbery or kidnapping given the large quantity of drugs for a first time transaction. (*See* Tr. 57:3–7 ("I was concerned because for a first-time transaction, that's a lot of money that's going to be involved for people that have never done business before. And in my experience, that's usually — it doesn't bode well. It's possibly be a robbery or a kidnapping."); *id.* at 77:9–19 (explaining the agents had expressed concerns about a "robbery crew"); *see also id.* at 98:1–5 (explaining that individuals serving as muscle generally carry firearms).) Given the constant radio communication, agents were aware their concerns of a "robbery crew" were unfounded given the smooth transaction. The Government is therefore left only with generalizations about drug dealers and their alleged accomplices. Under these circumstances, adopting the Government's position would effectively eviscerate the protections under *Miranda* for all suspects within the vicinity of a drug transaction — out of the generalized fear that they may be "muscle." (*See* Tr. 97:22-25 (explaining that the term "muscle" means anyone "in the area" to help those "conducting the drug transaction").) Rather than relying on an inference (that those nearby are muscle) built upon another inference (that drug dealers are dangerous), the Government must proffer a specific reason to believe a firearm or weapon may have been present. *See United States v. Jones*, 154 F. Supp. 2d 617, 628–29 (S.D.N.Y. 2001) (requiring "some specific reason, beyond generalizations about drug dealers, to think a gun was present").

## IV. Conclusion

For the foregoing reasons, the Court denies the motion for additional testimony and grants the motion to suppress the statement made prior to *Miranda* warnings.

                                                                    s/ MKB  
                                                  MARGO K. BRODIE  
                                                  United States District Judge

Dated:  December 21, 2017  
         Brooklyn, New York