UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------

UNITED STATES OF AMERICA,

**MEMORANDUM & ORDER**
17-CR-415 (MKB)

- against -

CLYDE MILLER,

Defendant.

----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

On September 13, 2018, a jury convicted Defendant Clyde Miller of conspiracy to

distribute and possess with intent to distribute heroin, in violation of 21 U.S.C. §§ 846 and

841(b)(1)(A)(i) (Count One); possession of a firearm during a drug trafficking crime, in violation

of 18 U.S.C. § 924(c)(1)(A)(i) (Count Two); and being a felon in possession of a firearm, in

violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2) (Count Three).  Defendant moves for a judgment

of acquittal as to Counts 1 and 2 of the Superseding Indictment or, alternatively, for a new trial

pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure.  (Def. Mem of Law in

Supp. of Def. Mot. ("Def. Mem."), Docket Entry No. 73.)  The government opposes Defendant's

motion.  (Gov't Mem. of Law in Opp'n to Def. Mot. ("Gov't Mem."), Docket Entry No. 76.)

For the reasons set forth below, the Court denies Defendant's motion.

I.    **Background**

In March of 2017, Detective Frank Canales of the Broward County Sheriff's Office

conducted an undercover drug trafficking operation, primarily investigating an individual named

Anthony Sean Yancey.  (*See* Trial Tr ("Tr.") 20–21.)  As part of the undercover operation,

Detective Canales arranged for Yancey to sell him three kilograms of heroin worth

approximately $170,000. (Tr. 30, 80.) During a meeting in Florida, Detective Canales met with an individual named Randy Stephens to discuss the purchase of the three kilograms of heroin. (Tr. 36–40.) Detective Canales subsequently spoke with Yancey over the telephone and both agreed that the transaction would take place in Brooklyn, New York. (Tr. 43–44.) Yancey indicated that he would bring other individuals to the drug transaction. (Tr. 44–45.)

On April 17, 2017, the day of the scheduled transaction, Detective Canales, Defendant, and Yancey all traveled to New York. Detective Canales flew from Florida to New York and met with special agents of the United States Drug Enforcement Administration ("DEA"). (Tr. 52.) Defendant drove 350 miles from Oil City, Pennsylvania to Brooklyn, New York, in a white Dodge Durango, leaving Oil City at approximately 3:00 AM and arriving in Brooklyn at approximately 9:24 AM. (Tr. 118–19, 252–53.) Yancey traveled from North Carolina, arriving in Brooklyn at some point in the morning.[1] (Tr. 57, 246.)

As part of the operation, the DEA agents, including Special Agent James Lee, conducted surveillance of Yancey beginning at approximately 10:30 AM on the morning of April 17, 2017. (Tr. 110.) Special Agent Lee observed Yancey with Defendant and another individual named Randy Jenkins[2] on Winthrop Street in Brooklyn throughout the morning. (Tr. 112.) At approximately 11:30 AM, a Lincoln Navigator vehicle arrived at Winthrop Street and DEA agents observed Yancey engage in conversation with William Fagan, the driver, outside of Defendant's presence. (Tr. 114–16.) Yancey also answered his telephone and made several

---

[1] Text communications between Yancey and William Fagan indicate that, at 7:17 AM, Yancey was driving to Brooklyn but was "[s]till two hours out." (Tr. 245–46.)

[2] The government presented evidence that Jenkins sent heroin samples to the Broward County Sheriff's Office in March of 2017 as part of the investigation, and communicated with Yancey about the April 17, 2017 drug transaction. (Gov't Ex. 14G.)

telephone calls in preparation for the drug transaction with Defendant nearby. (Tr. 117.)

Several hours into Agent Lee's surveillance of Yancey, Jenkins, and Defendant, all three left Winthrop Street in the Dodge Durango that Defendant drove from Pennsylvania to New York. (Tr. 117–18; Gov't Tr. Ex. 32.) At approximately 3:00 PM, the Durango, with the same occupants inside, arrived at a Hilton Hotel (the "Hotel") near the John F. Kennedy ("JFK") Airport, the agreed upon location of the drug transaction. (Tr. 121, 124–26.) After Yancey got out of the Dodge Durango in the parking lot of the Hotel, the Durango left the parking lot and parked about a block away. (Tr. 126.) Approximately twenty minutes later, Fagan arrived at the Hotel parking lot in the same Lincoln Navigator the agents observed earlier in the day. (Tr. 127.) After speaking with Yancey in the parking lot, Fagan walked to a Honda Pilot vehicle parked nearby and collected a black bag; Harold Sattan occupied the Honda Pilot vehicle. (Tr. 130–31.) Fagan and Yancey then proceeded into the Hotel, with Fagan carrying the black bag. (Tr. 130.) Defendant remained with Jenkins, who communicated with Yancey during the drug transaction. (Tr. 251–52.)

In a bathroom inside the Hotel, Yancey showed Detective Canales the drugs. (Tr. 91–92.) After showing Detective Canales the drugs, Yancey and Fagan walked out of the Hotel, with Fagan carrying the same black bag. (Tr. 130.) Fagan walked across the parking lot towards the Honda Pilot parked on 135th Avenue. (Tr. 130.)

Shortly thereafter, a supervising DEA agent signaled over the radio for the agents to arrest everyone. (Tr. 130–31.) The agents recovered drugs and a handgun from the Honda Pilot. (Tr. 131, 135–36, 176–77.) The agents also recovered a loaded, semi-automatic handgun from Defendant's person and a box of .380 caliber ammunition in the Dodge Durango. (Tr. 206.) The handgun recovered from Defendant used .380 caliber ammunition. (Tr. 255–56.) Agents also

recovered an additional loaded firearm from the vicinity of the Dodge Durango. (Tr. 253–54.) Extraction reports for a cellular telephone seized from Yancey during his arrest showed that Defendant and Yancey maintained a close relationship, communicating about their health problems, relationships, and anniversaries. (Tr. 240–44.)

At the conclusion of the government's presentation of evidence, Defendant moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. (Tr. 276.) The Court heard argument from both parties and reserved decision. (Tr. 281.) Defendant did not present any evidence. (Tr. 282.) After the jury's guilty verdict, Defendant renewed his Rule 29 motion, (Tr. 375), and the parties subsequently submitted written arguments.

## II. Discussion

### a. Standards of review

#### i. Rule 29

Rule 29 of the Federal Rules of Criminal Procedure provides that, the court "on the defendant's motion[,] must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "The test for sufficiency . . . is whether a rational jury could conclude beyond a reasonable doubt that a defendant is guilty of the crime charged." *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (citation and internal quotation marks omitted); *United States v. Odiase*, 312 F. Supp. 3d 432, 434 (S.D.N.Y. 2018) (stating that "the [c]ourt will not disturb the conviction so long as *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (citation and internal quotation marks omitted)). Thus, a defendant "challenging the sufficiency of the evidence against him under [Rule 29] after conviction by a jury 'bears a heavy burden.'" *United States v. Alston*, 899 F.3d 135, 143 (2d Cir. 2018) (quoting *United States v. Aguiar*, 737 F.3d

251, 264 (2d Cir. 2013)); *see also United States v. Cuti*, 720 F.3d 453, 461 (2d Cir. 2013) ("A

defendant challenging a conviction on sufficiency grounds undertakes a 'heavy burden.'"

(quoting *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011))); *United States v. Coplan*,

703 F.3d 46, 62 (2d Cir. 2012) (same).

In deciding the motion, the court must view the evidence "in the light most favorable to

the government, drawing all inferences in the government's favor." *Aguiar*, 737 F.3d at 264

(citation and internal quotation marks omitted). The "court 'must also be satisfied that the

inferences are sufficiently supported to permit a rational juror to find that [each] element . . . is

established beyond a reasonable doubt.'" *United States v. Triumph Capital Grp., Inc.*, 544 F.3d

149, 159 (2d Cir. 2008) (quoting *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995)).

In addition, the court must "defer[] to the jury's assessments of the witnesses' credibility."

*Aguiar*, 737 F.3d at 264. "[I]t is the task of the jury, not the court, to choose among competing

inferences that can be drawn from the evidence." *United States v. Jackson*, 335 F.3d 170, 180

(2d Cir. 2003). Moreover, "'traditional deference accorded to a jury's verdict is especially

important when reviewing a conviction for conspiracy . . . because a conspiracy by its very

nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid

bare in court with the precision of a surgeon's scalpel.'" *Eppolito*, 543 F.3d at 46 (quoting

*Jackson*, 335 F.3d at 180).

### ii. Rule 33

Under Rule 33 of the Federal Rules of Criminal Procedure, "[u]pon the defendant's

motion, the court may vacate any judgment and grant a new trial if the interest of justice so

requires." Fed. R. Crim. P. 33(a); *see also United States v. Vinas*, 910 F.3d 52, 58 (2d Cir. 2018)

(same); *Aguiar*, 737 F.3d at 264 (same). Generally, "a motion for a new trial 'should not be

granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" *Smith v. Carpenter*, 316 F.3d 178, 183 (2d Cir. 2003) (quoting *Atkins v. New York City*, 143 F.3d 100, 102 (2d Cir. 1998)). As the Second Circuit has stated:

> The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice. The trial court must be satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict. The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation. There must be a real concern that an innocent person may have been convicted.

*United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (citations and internal quotation marks). The court may "weigh the evidence" for itself and evaluate the credibility of the witnesses. *See United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992); *United States v. Lopac*, 411 F. Supp. 2d 350, 359 (S.D.N.Y. 2006) (stating that in deciding a Rule 33 motion, the court "is not required to view the evidence in the light most favorable to the government, but rather is to weigh the evidence and determine the credibility of witnesses"). The court must, however, "strike a balance between weighing the evidence and credibility of witnesses and not 'wholly usurping' the role of the jury." *Ferguson*, 246 F.3d at 133 (quoting *United States v. Autuori*, 212 F.3d 105, 120 (2d Cir. 2000)); *see also United States v. Cacace*, 796 F.3d 176, 192 (2d Cir. 2015) ("A court reviewing a post-trial motion may intrude only in 'exceptional circumstances.'" (quoting *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005))). Ultimately, the court should order a new trial if "it would be a manifest injustice to let the guilty verdict stand." *Sanchez*, 969 F.2d at 1414. Motions for a new trial pursuant to Rule 33 "are disfavored in this Circuit" and "should be granted only in the most extraordinary circumstances." *United States v. Figueroa*, 421 F. App'x 23, 24 (2d Cir. 2011) (citations omitted).

### b. Rule 29 motion

#### i. Conspiracy to distribute and possess with intent to distribute heroin

Defendant argues that the government's evidence was insufficient to convict him of the drug conspiracy because the government failed to demonstrate that Defendant had knowledge of the object of the conspiracy. (Defs. Mem. 12 ("The government failed to introduce any direct evidence that demonstrated that Mr. Miller had knowledge of the narcotics conspiracy.").) Defendant essentially argues that his "mere presence" at the scene of the crime does not establish his knowing and intentional membership in the drug conspiracy. (*See generally id*.)

The government argues that Defendant's "extraordinary travel plans," his co-conspirators' trust in him, his extensive telephone contact with Yancey, and his actions in protecting members of the narcotics conspiracy on the day of the transaction constitute sufficient evidence from which a reasonable juror could have concluded that Defendant was a knowing member of the drug conspiracy. (Gov't Mem. 16–19.)

"To prove conspiracy, the government must show that the defendant agreed with another to commit the offense; that he knowingly engaged in the conspiracy with the specific intent to commit the offenses that were the objects of the conspiracy; and that an overt act in furtherance of the conspiracy was committed." *United States v. Monaco*, 194 F.3d 381, 386 (2d Cir. 1999) (citation and internal quotation marks omitted). "[T]he existence of a conspiracy and a given defendant's participation in it with the requisite knowledge and criminal intent may be established through circumstantial evidence." *United States v. Stewart*, 485 F.3d 666, 671 (2d Cir. 2007). "Circumstantial evidence probative of a conspiracy may include, for example, a defendant's association with conspirators . . . his presence at critical stages of the conspiracy that cannot be explained by happenstance . . . or his possession of items that are of essential significance to the conspiracy[.]" *United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014)

(citations and internal quotation marks omitted); *United States v. Aleskerova*, 300 F.3d 286, 293 (2d Cir. 2012) ("A defendant's knowing and willing participation in a conspiracy may be inferred from, for example, h[is] presence at critical stages of the conspiracy that could not be explained by happenstance." (citation omitted)).  "The government need not show that the defendant knew all of the details of the conspiracy, 'so long as he knew its general nature and extent.'"  *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008) (quoting *United States v. Rosa*, 17 F.3d 1531, 1543 (2d Cir. 1994)).  However, "[p]roof that the defendant simply associated with conspirators is insufficient."  *Id.*; *see also United States v. Rodriguez*, 392 F.3d 539, 545 (2d Cir. 2004) ("Proof that the defendant knew that some crime would be committed is not enough." (citation and internal quotation marks omitted)).  "[A]bsent evidence of purposeful behavior, mere presence at the scene of a crime, even when coupled with knowledge that a crime is being committed, is insufficient to establish membership in a conspiracy . . . ."  *Aleskerova*, 300 F.3d at 292 (quoting *United States v. Chang An–Lo*, 851 F.2d 547, 554 (2d Cir. 1988)); *see also Anderson*, 747 F.3d at 61 ("[A] defendant's mere presence at the scene of a crime, his general knowledge of criminal activity, or his simple association with others engaged in a crime are not, in themselves, sufficient to prove the defendant's criminal liability for conspiracy."); *United States v. Torres*, 604 F.3d 58, 66 (2d Cir. 2010) ("Proof that the defendant engaged in suspicious behavior, without proof that he had knowledge that his conduct involved narcotics, is not enough to support his conviction for conspiracy to traffic in narcotics.").

"[I]n order to prove conspiracy, the government must demonstrate that the defendant possessed 'the specific intent to commit the offenses that were [its] objects.'"  *Anderson*, 747 F.3d at 61 (quoting *Huezo*, 546 F.3d at 180).  The government must prove "at least the degree of criminal intent necessary for the substantive offense itself."  *Torres*, 604 F.3d at 65.  To prove

conspiracy to distribute and possess with intent to distribute a controlled substance, the government must establish that Defendant acted "knowingly or intentionally [to] . . . possess with intent to . . . distribute . . . a controlled substance." 21 U.S.C. § 841(a)(2); *see also Anderson*, 747 F.3d at 61 ("As to intentional possession and distribution of a controlled substance, the government must . . . prove that the defendant knew he was dealing with a controlled substance" (citation and internal quotation marks omitted)).

The government has presented sufficient evidence from which the jury could have found that Defendant served as a lookout or as protection during the drug transaction at the Hotel.[3] After Jenkins drove Defendant and Yancey to the Hotel in Defendant's vehicle and dropped off Yancey at the Hotel's entrance where Yancey conducted the drug transaction, Defendant and Jenkins parked the vehicle one block away from the Hotel and both remained next to the Dodge Durango as the transaction took place inside of the Hotel. (Tr. 118, 124–26.) Defendant and Jenkins were "close enough to be able to respond to the parking lot of the Hilton Hotel in case something happened." (Tr. 200 (testimony of Agent Ian Neckin).) In addition, Defendant possessed a loaded handgun and the Dodge Durango, the vehicle Defendant drove from Pennsylvania that morning, contained a box of ammunition of the same caliber as Defendant's weapon. (Tr. 206, 256.) Viewed in the light most favorable to the government, the government presented sufficient evidence from which the jury could have found that Defendant served as a lookout. *See Rodriguez*, 392 F.3d at 545–56 (finding that the government presented sufficient evidence from which the jury could find that the defendant acted as a lookout based on testimony that the defendant "engaged in countersurveillance activity outside of the" location where the

---

[3] Defendant argues that the government "shifted its theory" during summation and argued that Defendant acted as a lookout without any basis in the evidence. (Def. Mem. 17.) For the reasons discussed *infra*, the Court finds Defendant's argument unpersuasive.

drug transaction took place, later entered the location, and exited the location minutes after the transaction ended).

However, serving merely as a lookout is insufficient to satisfy the government's burden. The government must prove beyond a reasonable doubt that Defendant had knowledge and specific intent to participate in the drug conspiracy. *See id*. at 546 ("Nevertheless . . . a critical question remains: whether the government proved beyond a reasonable doubt that [the defendant] had the knowledge and specific intent to aid and abet a drug transaction."); *see also United States v. Dean*, 59 F.3d 1479, 1486–87 (5th Cir. 1995) (noting that evidence establishing that the defendant acted as a lookout was alone insufficient to show that he knew he was conducting countersurveillance for a drug transaction).

Viewing the evidence in the light most favorable to the government, the evidence at trial sufficiently established Defendant's knowing and intentional participation in the drug conspiracy. The government demonstrated Defendant's knowing participation in the conspiracy not merely through his presence at the drug transaction but through his actions in advancing the drug conspiracy: on the day of the drug transaction, Defendant traveled 350 miles from Pennsylvania to New York, leaving Pennsylvania at approximately 3:00 AM, and arriving in Brooklyn, New York at approximately 9:24 AM, (Tr. 253); Defendant was with Yancey and other co-conspirators the morning of the narcotics transaction, (Tr. 113–16); although Defendant was not the driver, Defendant traveled to the Hotel, the location of the drug transaction, with Yancey in the Dodge Durango, the vehicle Defendant drove from Pennsylvania, (Tr. 117–18); Defendant remained a block away during the drug transaction with Jenkins and Jenkins communicated with Yancey during the drug transaction, (Tr. 251–52); and Defendant possessed a loaded gun with ammunition while outside of the Hotel, (Tr. 255). In addition, while

Defendant and Jenkins spoke to each other while parked a block from the Hotel, Yancey called Jenkins immediately prior to and during the drug transaction. (Tr. 181, 203, 251; Gov't Ex. 14G.) Although the contents of these conversations were not presented to the jury, under the circumstances, the jury could have properly inferred that Yancey and Jenkins were discussing the ongoing drug transaction and that Defendant, who was with Jenkins at the time of the calls, heard those discussions. The jury could have also drawn the inference that Yancey, Jenkins, and others would not have trusted Defendant to provide the transportation and accompany them to the drug transaction and be present in the vicinity of the drug transaction involving three kilograms of heroin worth approximately $170,000 without the Defendant knowing the nature of the transaction. As the Second Circuit has noted, "jurors are entitled, and routinely encouraged, to rely on their common sense and experience in drawing inferences." *Huezo*, 546 F.3d at 182 (finding that "[b]ased on the complexity and scale of the money laundering scheme, common sense and experience would support an inference that the principals in the conspiracy would not have trusted an outsider (with no knowledge of their criminal purpose) to transport $1 million in laundered funds, to be present when [a co-conspirator] removed the first suitcase containing $500,000 from the trunk, and to share a house over several days with witting conspirators").

Defendant relies primarily on *Torres*, *United States v. Lorenzo*, 534 F.3d 153 (2d Cir. 2008), and *Rodriguez* to argue that he was merely present during the drug transaction and that the government failed to prove his knowing participation. Defendant argues that the evidence in this case is "considerably weaker" than evidence the Second Circuit has found insufficient to sustain a drug conspiracy conviction in *Torres*, *Lorenzo*, and *Rodriguez*. (Def. Mem. 15.)

In *Torres*, the Second Circuit reversed the defendant's conviction for a narcotics conspiracy because the evidence was insufficient to show beyond a reasonable doubt that the

defendant acted knowingly and with the intent to further the objectives of the conspiracy. *Torres*, 604 F.3d at 71–72. The government's evidence "consisted principally of [ten] one-kilogram bags containing cocaine and the testimony of law enforcement agents and employees of United Parcel Service ("UPS") with respect to the efforts of [the defendant] . . . to take delivery of the boxes in which the cocaine had been shipped."[4] *Id.* at 61. The Second Circuit found that the government "presented no evidence as to the nature of [the defendant's] associations with the persons who shipped the cocaine or with the persons who expected to distribute it . . . no evidence of a sizeable payment to [the defendant] that might reflect an expectation related to the million-dollar street value of the cocaine . . . [and] no evidence of any conduct by [the defendant] other than his efforts to gain possession of the [p]ackages, which . . . did not show that he had knowledge of the [p]ackage's contents." *Id.* at 71. In addition, there was no evidence that the defendant was placed in a position of trust because the defendant was never in a position to be alone with the narcotics and thus the record did not "lend itself to an inference that [the defendant] was so trusted that he must have known that he was dealing with narcotics." *Id.*

Similarly, in *Lorenzo*, the Second Circuit found that the government presented insufficient evidence at trial to sustain a conspiracy conviction because the evidence lacked "a

---

[4] In *Torres*, the government also introduced evidence of a telephone number provided for the defendant on the packages' shipping labels and calls between that telephone number and drug shippers in Puerto Rico. *United States v. Torres*, 604 F.3d 58, 70 (2d Cir. 2010). The government argued that because that telephone number was on the shipping label as the defendant's contact number, the defendant had repeated contacts with drug shippers in Puerto Rico, but the Second Circuit rejected that characterization because it was not sufficiently supported by evidence. *Id.* The evidence showed that the telephone number was registered to a different individual, that a caller who called UPS on the day the package was to be picked up identified himself as someone other than the defendant, that calls were made from that telephone number after the defendant was in custody, and, in addition, the government provided no evidence that the defendant was a party to any call with the Puerto Rican shippers of narcotics. *Id.*

critical element — any indication from which a jury could reasonably infer that [the defendant] knew of the nature and specific object of the conspiracy." 534 F.3d at 160. The evidence in *Lorenzo* consisted of the testimony of a narcotics courier who testified that he made two separate trips to the United States to deliver drugs, and on the first trip, the defendant gave the courier $14,000 for delivery to the Dominican Republic, which the government argued were proceeds of the conspiracy. *Id*. The Second Circuit found that the government did not present any evidence that the defendant knew that the courier was delivering drugs. *Id*. During the courier's second trip, which involved an attempted controlled delivery to the defendant, the defendant was asleep at all relevant times and thus there was no evidence that the defendant participated in, or had knowledge of, the second transaction. *Id.* at 157, 161. The government presented evidence that during the second transaction, the courier attempted to call the defendant, but his wife answered the telephone because the defendant was asleep. *Id*. at 156. After an invitation from the defendant's wife, the courier brought the drugs to the defendant's home. *Id.* at 157. The government argued that the defendant's knowledge of the drug conspiracy could be inferred because the principal "would not have entrusted [the defendant] with the suitcases concealing the narcotics . . . unless [the defendant] had known what was concealed within them." *Id.* at 161. The Second Circuit, however, rejected the proposed inference, finding that the "unfulfilled request for [the defendant]," was "speculative and attenuated," having been "severel[y] undermine[d]" by his wife's failure to awaken him when the courier attempted to establish contact with him. *Id.*

In *Rodriguez*, as in *Torres* and *Lorenzo*, the Second Circuit reversed a conviction for possession with intent to distribute heroin (under theories of aiding and abetting and constructive possession) and conspiracy to distribute heroin. 392 F.3d at 541, 544–45. The government

presented evidence that the defendant acted as a lookout and engaged in countersurveillance for a heroin transaction at a Boston Market, and that the defendant owned the vehicle that was used by a co-conspirator during the transaction. *Id.* at 542–43, 546. The defendant argued that, while he knew he was serving as a lookout, he had no knowledge that his co-conspirator was engaged in a heroin transaction as opposed to any other illegal activity. *Id.* at 546, 548. To show the defendant's knowledge of the narcotics transaction, the government presented evidence of telephone calls and pages between the defendant and a co-conspirator. *Id.* at 547. The Second Circuit held that in the absence of "evidence of the precise contents of the conversations," the conversations alone failed to support the conclusion that defendant knew of the precise nature of the criminal activity of his co-conspirator. *Id.* at 547–48.

The Court acknowledges, as Defendant argues, (Def. Ltr. dated Apr. 2, 2019 ("Def. Ltr."), Docket Entry No. 80), the similarity between the facts of this case and the facts in *Rodriguez*, including the reliance on telephone conversations without any evidence of the content of the conversations. However, a significant distinguishing factor in this case that provided evidence from which a reasonable jury could infer Defendant's knowledge, is the Defendant's actions on the day of the drug transaction. As the government argues, unlike in *Rodriguez*, the evidence here consists of Defendant's actions both prior to and during the drug transaction, including "being present for conversations planning the imminent drug deal and then [traveling] with his co-conspirators to complete the drug deal," (Gov't Ltr. dated Feb. 29, 2019, 3 ("Gov't Ltr."), Docket Entry No. 79), in addition to his actions as a lookout. Further, on the day of the drug transaction, Defendant drove 350 miles from Oil City, Pennsylvania to Brooklyn, New York, leaving Pennsylvania at approximately 3:00 AM to meet with Yancey who was also driving to New York from North Carolina that day solely for the purpose of conducting the drug

transaction with the undercover agent.  (Tr. 252–53.)  Defendant arrived in Brooklyn at approximately 9:24 AM, (Tr. 119), the same time as Yancey, (Tr. 245–46).  Upon arrival, Defendant, Yancey, and Jenkins hung out and spoke with each other throughout the morning, (Tr. 141); Indeed, Detective Canales testified that during a telephone conversation with Yancey at approximately 11:48 AM on the morning of the drug transaction, Yancey stated "[w]e [are] only waiting on you right now," which Detective Canales understood to mean that "Yancey and his associates were ready to go."  (Tr. 79.)  At some point during the early afternoon, Yancey, Jenkins, and Defendant drove together to the Hotel, in the Dodge Durango, for the drug deal. (Tr. 143.)  Thus, the evidence supports a reasonable inference that Defendant drove from Pennsylvania in the early morning hours to arrive in Brooklyn and to meet with Yancey for the purpose of knowingly and intentionally participating in the drug transaction.

Although the facts in *Rodriguez* bear similarities to the facts in this case, there is no alternative suggestion in the record to explain Defendant driving 350 miles during the very early morning hours on the day of the drug transaction to arrive in Brooklyn at the same time as Yancey, remaining with Yancey the entire time he was in Brooklyn, riding with Yancey to the Hotel where Yancey engaged in the drug transaction with Detective Canales, and waiting close by in the vehicle with a loaded firearm.  *See United States v. Martino*, 759 F.2d 998, 1003 (2d Cir. 1985) (upholding the defendant's conviction for drug conspiracy where the defendant joined a co-conspirator on the morning of the drug deal and accompanied him to borrow a vehicle, the defendant drove the vehicle to the time and place pre-arranged for the drug transaction on that same day, and the defendant remained parked alongside the drug-buyer as the transaction took place); *United States v. Pedroza*, 750 F.2d 187, 199 (2d Cir. 1984) ("[T]he evidence against [the defendant] was not limited to proof that he was present at certain critical stages of the conspiracy

in a way that could have resulted from happenstance . . . . [The defendant] had to criss-cross the country to be present at the critical times; and there is nothing in the record to suggest that he may have had any purpose in these long trips and timely appearances other than to further the goals of the conspiracy.")  Although Defendant elicited testimony that these actions are consistent with Defendant just being friends with Yancey, (Tr. 260), it was the jury's role to choose among any competing inferences.  *See Lorenzo*, 534 F.3d at 159 (holding that the court must "defer to a jury's assessments with respect to credibility, conflicting testimony, and the jury's choice of the competing inferences that can be drawn from the evidence").

Viewing the evidence in its totality and in the government's favor, *Huezo*, 546 F.3d at 183, and understanding that courts afford a "high degree of deference to a jury verdict" when reviewing a conviction for conspiracy, *Anderson*, 747 F.3d at 72–73, based on the testimony of the law enforcement witnesses and the evidence introduced at trial, a reasonable juror could have concluded beyond a reasonable doubt that Defendant knowingly participated in the narcotics conspiracy.

### ii.    Summations

Defendant also argues that the government provided the jury with an erroneous definition of mere presence[5] and "during summations . . . shifted its theory" by arguing that Defendant "was acting as a 'lookout' for Yancey despite no witness testifying to such and the lack of any evidence establishing it."  (Def. Mem. 17.)

"The prosecution and the defense are generally entitled to wide latitude during closing arguments, so long as they do not misstate the evidence."  *United States v. Tocco*, 135 F.3d 116,

---

[5]  Defendant contends that, during summation, "[t]he government stated that mere presence was when a person 'just happen[s] to be there' but doesn't know the perpetrators of the crime and has never seen them before."  (Def. Mem. 17 (quoting Tr. 321).)

130 (2d Cir. 1998). "Improper statements made during summation require a new trial when such statements 'cause[d] the defendant substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process.'" *United States v. Faisal*, 282 F. App'x 849, 850 (2d Cir. 2008) (quoting *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir. 1999)); *see also United States v. Edwards*, 342 F.3d 168, 181 (2d Cir. 2003) ("Improper summation statements violate a defendant's due process rights only if they cause substantial prejudice to the defendant." (citation and internal quotation marks omitted)); *United States v. Mapp*, 170 F.3d 328, 337 (2d Cir. 1999) ("[R]arely will an improper summation meet the requisite level of prejudice."); *United States v. Russo*, 74 F.3d 1383, 1396 (2d Cir. 1996) (stating that it is improper for prosecutors to introduce a new theory of criminal liability at the last minute of trial).

As discussed above, the government presented sufficient evidence from which the jury could have inferred that Defendant acted as a lookout during the drug transaction. However, even if the government "gave erroneous statements [during summation] concerning the applicability of the mere presence defense," (Def. Mem. 18), the error "was not 'so egregious as to infect the proceedings in such a manner as to deprive [the] defendant of due process." *Faisal*, 282 F. App'x at 852 (quoting *Tocco*, 135 F.3d at 130). Any alleged harm was cured by the Court's jury instructions, in which the Court provided the jury with the parties' agreed upon definition of "mere presence." The Court instructed the jurors "that merely being present at a place where criminal conduct is underway does not make a person a member of a conspiracy to commit the crime." (Tr. 346–47.) The Court further noted that, "mere association with one or more members of the conspiracy does not automatically make that person a member. A person may know or be friendly with a criminal without being a criminal himself." (Tr. 347.) In

addition, the Court instructed the jury to only follow the Court's instructions when deliberating.[6]

Further, Defendant's argument that the government shifted its theory during summation is meritless. The government's theory of criminal liability was consistent throughout the trial and there was sufficient evidence for the jury to infer that Defendant acted as a "lookout" during the transaction. As discussed *supra*, Defendant remained a block away from the Hotel with Jenkins, and Jenkins was in communication with Yancey during the drug transaction. (Tr. 251–52.) In addition, Defendant possessed a loaded gun with ammunition while waiting in the vehicle a block away from the Hotel. (Tr. 255.) At least one agent testified that Defendant and Jenkins were "close enough to be able to respond to the parking lot of the Hilton Hotel in case something happened." (Tr. 200 (testimony of Agent Ian Neckin).)

Accordingly, the Court finds that the government did not shift its theory of criminal liability during summations. *See United States v. Salameh*, 152 F.3d 88, 139–40 (2d Cir. 1998) (rejecting the defendant's argument that the government unfairly raised new theories of guilty during summation because the government's theory of [the defendant's] criminal liability was consistent throughout its opening statement and summation).

### iii.  Possession of a firearm in furtherance of a drug trafficking crime

Defendant argues that the Court should enter a judgment of acquittal as to his conviction for possession of a firearm in furtherance of a drug trafficking crime for the same reasons he seeks a judgment of acquittal as to his conspiracy conviction. (*See generally* Def. Mem.)

---

[6] Further, prior to opening statements, the Court instructed the jury that "statements, arguments, and questions by the lawyers are not evidence." (Tr. 4.) Prior to summations, the Court again instructed the jury that "summation is not evidence [,]" rather it is "simply the attorney's view of what the evidence shows." (Tr. 283.) In addition, the Court specifically instructed the jury that "[i]f there appears to be any difference between the law as stated by counsel and the law as [the Court] now state[s] it to [the jury], [the Court's] instructions on the law are the ones that [the jury] must follow." (Tr. 327.)

The government argues that Defendant's challenge to his conviction for unlawful use and possession of a firearm in furtherance of drug crimes must also be denied "because the jury's verdict of guilt as to Count One was reasonable in light of the evidence presented at trial, they were permitted to reach a verdict on Count Two, and could properly conclude that the defendant was guilty of possessing a firearm." (Gov't Mem. 22.) The government also argues that "the evidence established that the defendant did in fact possess a firearm in furtherance of the narcotics conspiracy . . . and . . . [D]efendant concedes that he possessed a loaded handgun at the time of his arrest." (*Id.*)

Federal law criminalizes possession of a firearm in furtherance of a drug trafficking crime. "[A]ny person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime . . . be sentenced to a term of imprisonment of" not less than five, seven, or ten years, depending on whether the firearm was possessed, brandished, or discharged. 18 U.S.C. § 924(c)(1)(A); *see also United States v. Lewter*, 402 F.3d 319, 321 (2d Cir. 2005) ("Federal law criminalizes the mere possession of a firearm only if that possession is 'in furtherance of' a drug trafficking crime."). "[T]he requirement in § 924(c)(1) that the gun be possessed in furtherance of a drug crime may be satisfied by a showing of some nexus between the firearm and the drug selling operation." *United States v. Finley*, 245 F.3d 199, 203 (2d Cir. 2001). "[T]he test is whether a reasonable jury could, on the evidence presented at trial, find beyond a reasonable doubt that possession of the firearm facilitated a drug trafficking crime . . . ; 'in furtherance' means that the gun afforded some advantage (actual or potential, real or contingent) relevant to the vicissitudes of drug trafficking." *Lewter*, 402 F.3d at 322; *see also United States v. Chavez*, 549

F.3d 119, 130 (2d Cir. 2008) (holding that "the ultimate question is whether the firearm afforded some advantage (actual or potential, real or contingent) relevant to the vicissitudes of drug trafficking" (citation and internal quotation marks omitted)).

The government's evidence at trial was sufficient to establish beyond a reasonable doubt that Defendant possessed a loaded handgun to protect himself, Yancey, and other co-conspirators, during the drug transaction. Yancey and other members of the conspiracy had negotiated the transaction of three kilograms of heroin worth approximately $170,000. They, like the undercover agent, understood the dangers involved in conducting a drug transaction where the players were not familiar with each other and were conducting their first transaction with each other. (Tr. 30–31, 48.) Indeed, Yancey told the undercover agent that he would bring people with him to the drug deal and that they "would be in the general area . . . where the drug transaction was going to take place." (Tr. 45 (testimony of Detective Canales).) Defendant possessed his loaded gun as he sat in a car one block away from the Hotel. (Tr. 126.) Defendant and Jenkins dropped Yancey off at the Hotel for the drug transaction and it was reasonable for the jury to have inferred that they were waiting to pick him up at the conclusion of the transaction. While waiting, Defendant and Jenkins were parked where they could see who was coming in and out of the Hotel and quickly respond to the Hotel if necessary. (Tr. 200.) This evidence was sufficient to permit the jury to draw reasonable inferences and to conclude that Defendant was guilty of possession of the firearm in furtherance of the drug trafficking conspiracy.

The Court therefore denies Defendant's Rule 29 motion.

### c.  Defendant's motion for a new trial

Defendant argues that the Court should order a new trial on Counts One and Two "to

prevent the injustice that would result from the government obtaining a conviction against Mr. Miller." (Def. Mem. 18.) In support of this argument, Defendant contends that "[t]o account for its insufficient evidence[,] the government repeatedly mischaracterized the facts, the evidence, and the law" by giving the jury a legally erroneous definition of "mere presence." (*Id*. at 19.) Defendant also argues that "government failed to introduce evidence relevant to [Defendant's] knowledge or his intent in respect to the narcotics conspiracy" and instead argued that Defendant's "friendships with Yancey and Jenkins combined with his presence in the vicinity of where the drug transaction occurred established that he was a knowing participant with the requisite intent." (*Id*.) Defendant argues that, as a result, "[t]he jury's verdict was undoubtedly a response based on these mischaracterizations and not a rational assessment of the evidence." (*Id*.)

The government argues that Defendant's motion for a new trial should be denied for the same reasons the Court should deny Defendant's motion for a judgment of acquittal. (Gov't Mem. 23.) In addition, the government argues that "the evidence . . . demonstrates that there can be no real concern that an innocent person may have been convicted." (*Id*.)

As discussed *supra*, in light of the evidence at trial which was sufficient to allow a reasonable juror to conclude that the government proved all the elements of the drug trafficking conspiracy and possession of a firearm in furtherance of the drug trafficking conspiracy beyond a reasonable doubt, the Court finds that permitting the guilty verdict to stand will not result in manifest injustice. The Court therefore denies Defendant's motion for a new trial.

### III. Conclusion

For the foregoing reasons, the Court denies Defendant's motion in its entirety.

Dated: May 23, 2019
      Brooklyn, New York

SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge